**SO ORDERED.**

**SIGNED this 26 day of September, 2012.**

_____
Randy D. Doub
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:

CONSTRUCTION SUPERVISION SERVICES,      CHAPTER 11
INC.,      CASE NO. 12-00569-8-RDD

    **DEBTOR**

**ORDER HOLDING MONSON OIL COMPANY,
INC. IN CONTEMPT AND AWARDING SANCTIONS**

Pending before the Court is the Motion to Hold Monson Oil Company, Inc. in Contempt of Court for Violation of Automatic Stay filed by Construction Supervision Services, Inc. on July 26, 2012 (the "Motion") and the Response of Monson Oil Company, Inc. to Debtor's Motion for Contempt of Court for Violation of Automatic Stay filed by Monson Oil Company, Inc. on August 13, 2012 (the "Response"). On September 11, 2012, the Court held a hearing on the Motion and the Response in Wilson, North Carolina.

**BACKGROUND**

Construction Supervision Services, Inc. (the "Debtor") filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code on January 24, 2012. The Debtor is a full-service construction company located in Raleigh, North Carolina. The Debtor contracted post-petition with

Monson Oil Company, Inc. ("Monson") to provide fuel for its construction equipment. Under the terms of the contract, Monson provided the Debtor with fuel tanks that it filled based on the Debtor's fuel needs. Though Monson's accounting system listed the Debtor's payments as due ten days from delivery, generally Monson expected payment for deliveries weekly. Fuel was to be delivered to the Debtor and the amount owed was to be calculated weekly at close of business on Tuesday afternoon. Monson would then submit an invoice to the Debtor via email on Wednesday. The Debtor was to have a check ready for Monson's delivery driver to pick up on Thursday at the scheduled delivery time.

Generally, the Debtor made a check available to Monson's driver every Thursday when he made his delivery. However, on the date the Debtor alleges Monson violated the stay, the Debtor failed to provide the driver with a check at the time of delivery. Finch Monson, manager of Monson as of June 28, 2012, testified that his driver informed him that the Debtor did not have a check ready for the previous week's deliveries. Upon learning no check was ready, Mr. Monson called the Debtor and spoke with the President, Jeremy Spivey. Mr. Monson informed Mr. Spivey that if payment was not made, Monson would lock or disable the fuel pumps pending payment. Mr. Spivey informed Mr. Monson that he would deliver a check on June 28 but the funds may not be available for deposit until later that afternoon. The two agreed that Monson's driver would return to the Debtor's office to pick up the check and Mr. Spivey would contact Mr. Monson when the funds were available for deposit. Mr. Monson stated that he would have the fuel pumps disabled until he received notice that the funds were available. Mr. Monson contacted a third party contractor, C-

Store Services, to disable the fuel pumps at approximately 10:00 on the morning of June 28, 2012.[1] Sometime later that same afternoon, Mr. Monson received notice that the fuel pumps had been disabled. Subsequently, at approximately 4:30 that afternoon, Mr. Monson received notice from Mr. Spivey that the funds were available and the check could be deposited. Mr. Spivey then contacted Mr. Monson to find out when the fuel pumps would be operational again. Mr. Monson informed him he would have the contractor enable them as soon as possible, but it would not likely occur until the following morning. Mr. Spivey requested that the pumps be operational by 6:00 the following morning.

On the morning of June 29, 2012, around 6:00 am, the Debtor's drivers arrived at the office location to refuel trucks and equipment. When the drivers attempted to refuel, they discovered the fuel pumps were not operational. The drivers were instructed to use hand pumps to fuel their vehicles. Mr. Spivey testified the employees became concerned about the situation and questioned whether they were stealing fuel by using hand pumps to pump it from the tanks. Mr. Spivey testified that several drivers were late to their job sites because of the delay in refueling. Mr. Spivey explained most job owners required the Debtor to be at the job site by 7:00 am every morning, so the delay affected several construction jobs. Furthermore, Mr. Spivey stated the events had a negative effect on employee morale and fueled rumors that the Debtor was unable to pay its debts

---

[1] At one time prior to the present instance, the Debtor failed to remit payment to Monson. On that occassion, Mr. Monson informed the Debtor he would place a lock on the fuel pumps. As he was about to lock the pumps, the Debtor brought Mr. Monson a check and he left without locking the pumps. On this occasion, Mr. Monson discovered that his pump locks would not properly fit these particular pumps. Therefore, when the Debtor did not pay Monson on June 28, 2012, Mr. Monson realized the pumps must be disabled by some other means.

3

throughout the construction industry as employees discussed the problems with other construction crews.[2]

Mr. Monson testified that on June 29, 2012, at his direction, an employee from C-Store Services went directly to the Debtor's location before reporting to work and reassembled the pumps. Mr. Monson testified he received confirmation from C-Store Services that the pumps were operational at approximately 7:45 am on June 29.

Neither Mr. Monson nor Mr. Spivey could accurately estimate the amount of fuel remaining in the tanks at the time they were disabled. However, Mr. Monson testified he believed the tanks were each approximately one-quarter full at the time they were disabled. Further, Mr. Monson testified that had the Debtor not remitted payment on June 28, 2012 he eventually would have taken action to repossess the fuel remaining in the tanks.

In the Motion, the Debtor requests the Court hold Monson in contempt for its actions as they were in violation of the automatic stay. In particular, the Debtor asserts Monson violated 11 U.S.C. § 362(a)(3) by exercising control over property of the estate. The Debtor contends that as a result of Monson's actions, it was unable to fuel trucks and equipment in a timely manner, which caused delays in business on June 29 and negatively impacted employee morale. The Debtor requests sanctions in the amount of $29,559.43, the exact amount of the allowed administrative expense claim in favor of Monson in the Debtor's bankruptcy case.[3]

---

[2] Mr. Spivey testified that this situation, in conjunction with a ten cent per hour salary reduction for employees, fostered greater doubt and unrest among employees.

[3] After Monson filed an application for an administrative expense claim pursuant to 11 U.S.C. § 503(b)(9), the parties agreed Monson should have an allowed claim of $29,559.43 for fuel delivered within 20 days of the commencement of the bankruptcy case by an order entered

In the Response Monson argues it should not be held in contempt for violation of the automatic stay as its actions were based on a post-petition contract between the Debtor and Monson and did not violate the stay. Further, at the hearing, Monson argued its actions did not rise to the level of willful and knowing violations of the automatic stay because it was unaware the stay applied to contracts formed post-petition.

## DISCUSSION

Section 362(a) of the Bankruptcy Code imposes a stay on "any act to obtain possession of . . . or to exercise control over property of the estate." 11 U.S.C. § 362 (a)(3); *In re Figured*, No. 09-03251-8-JRL, 2009 WL 2843320, at *2 (Bankr. E.D.N.C. Aug. 31, 2009). Except as provided in 11 U.S.C. § 541(b), (c)(2), property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case" as well as "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(1), (7); *In re Figured*, 2009 WL 2843320, at *2.

Further, the Bankruptcy Code provides that any "individual injured by any willful violation of a stay provided by this section shall recover actual damages including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1). This Court has held "willfulness does not refer to the intent to violate the automatic stay, but the intent to commit the act which violates the automatic stay." *Lofton v. Carolina Fin. LLC (In re Lofton)*, 385 B.R. 133, 140 (Bankr. E.D.N.C. 2008) (citing *Citizens Bank v. Strumpf*, 37 F.3d 155 (4th Cir.1994), *rev'd on other grounds* 516 U.S. 16, 11 (1995)). Furthermore, "[i]f the creditor intentionally acts

---

on June 27, 2012.

and its actions violate the automatic stay, the creditor's acts are willful." *In re Jones*, No. 06-00380-8-RDD, at 3 (Bankr. E.D.N.C. June 27, 2007).

Based on the evidence received, the Court finds Monson was aware that the automatic stay was in place on June 28, 2012. Mr. Monson testified he had knowledge of the Debtor's bankruptcy petition on January 24, 2012; that after filing the bankruptcy petition, the Debtor approached Monson about supplying it with fuel; and that Monson and the Debtor entered into a post-petition agreement for the supply of fuel. Further, Mr. Monson testified after entering into the post-petition agreement, Monson opened a new account for the Debtor in its record keeping system, which separated pre-petition and post-petition invoices. Mr. Monson testified that in light of the circumstances, opening a new account for the Debtor seemed appropriate. Therefore, the Court finds Monson had knowledge of the Debtor's bankruptcy petition on June 28, 2012.

Furthermore, Monson acted to exercise control over property of the estate by dispatching C-Store Services to disable the fuel pumps. Such action was in violation of the automatic stay because the fuel in the tanks became property of the estate as the Debtor acquired an interest in the fuel after the commencement of the case pursuant to § 541(a)(7). Further, Mr. Monson testified that if payment was not received the company would have attempted to pump the fuel out of the tanks, evidencing Monson's intent to exercise control over or obtain possession of property of the bankruptcy estate. Therefore, the Court finds Monson's actions were willful violations of the automatic stay.

Monson argues its actions were not willful because it had no knowledge that the automatic stay protected property of the estate post-petition and the violation was inadvertent. Courts in this

district have held where "a creditor is uncertain about the scope of the automatic stay, he takes the risk of being assessed for damages if he fails to obtain clarification from the bankruptcy court." *In re Armstrong*, 96 B.R. 55, 57 (Bankr. E.D.N.C. 1989) (citing *In re Outlaw*, 66 B.R. 413, 419 (Bankr. E.D.N.C. 1986)).  By disabling the fuel pumps, Monson achieved the exact result it intended, to limit the Debtor's ability to use the fuel.  Therefore, regardless of whether Monson knew the automatic stay applied to post-petition property of the estate, its actions were willful violations of the stay and no privilege will be allowed for its ignorance.

The Motion is **GRANTED**.  However, the Court finds Monson took expedient action to remedy the violation of the automatic stay, which limited the Debtor's damages.  Therefore, the Court finds the Debtor is entitled to sanctions in the amount of $500.00.  Additionally, the Debtor's attorney, Mr. William Janvier, is entitled to attorneys' fees of $1,000.00 for filing and prosecuting the Motion.  The sanctions and attorneys' fees shall offset Monson's administrative expense claim of $29,559.43.  Monson's administrative expense claim pursuant to § 503(b)(9) shall be reduced by $1,500.00 and therefore be allowed in the amount of $28,059.43.  Monson shall credit the Debtor's account accordingly within ten days from the entry of this order.

**SO ORDERED**.

**END OF DOCUMENT**