**SO ORDERED.**

**SIGNED this 13 day of August, 2015.**

*Stephani W. Humrickhouse*
**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:

CONSTRUCTION SUPERVISION SERVICES,      CHAPTER 7
INC.      CASE NO. 12-00569-8-SWH

    DEBTOR

### ORDER

The matters before the court are Branch Banking and Trust Company's application for allowance of administrative expense claim, Branch Banking and Trust Company's motion to allow attorneys' fees, costs and post-petition interest pursuant to 11 U.S.C. § 506(b), and the chapter 7 trustee's objections thereto. The court conducted hearings to consider these matters in Greenville, North Carolina on December 1, 2014 and in Raleigh, North Carolina on April 21, 2015.

### BACKGROUND

Construction Supervision Services, Inc., the debtor, filed a petition for relief under chapter 11 of the Bankruptcy Code on January 24, 2012. As of the petition date, the debtor operated a full service construction company and was performing work as a subcontractor or general contractor on multiple pending projects. Also as of the petition date, the debtor was indebted to various material

suppliers. The debtor relied on the collection of receivables from project owners to fund its operational expenses.

Branch Banking and Trust Company ("BB&T") is a secured creditor of the debtor pursuant to several promissory notes, deeds of trust and security agreements executed by the debtor. BB&T's security interest includes accounts receivable, real property located at 300 Sigma Drive, Garner, North Carolina and certain personal property. BB&T filed a number of proofs of claim in the total amount of $1,265,868.55, representing unpaid principal, interest and fees other than attorneys' fees and costs. The debtor scheduled the value of its total accounts receivables at $5,514,574.50[1], its real property at $1,050,000 and its personal property subject to BB&T's lien at $37,000 (the debtor scheduled additional personal property subject to other creditors' security interests, as well). Debtor's Schedule D indicated that BB&T was fully secured and held a first priority security interest in its collateral. The parties do not dispute that, in accordance with the values set forth in the schedules, BB&T was an oversecured creditor as of the petition date.

In reliance upon the debtor's schedules and the status of then-filed liens, the debtor sought and was granted authority to use cash collateral by order dated January 31, 2012. The cash collateral order provided, *inter alia*, that BB&T would be granted a super-priority administrative claim under § 507(b) if there was a failure of adequate protection. The order further provided that the debtor was to use cash collateral for its ordinary and necessary expenses, and make adequate protection cash payments to BB&T as set forth on an attached budget. The court entered subsequent orders

---

[1] The debtor attached an aging report to its schedules that indicates current A/R at $1,165,382; 31-60 days at $1,371,916; 61-90 days at $479,687; 91-120 days at $26,966; over 120 days at $829,661; and, retainage at $479,636.

authorizing the debtor's use of cash collateral all of which included the same or similar language. BB&T collected a total of $62,900 in adequate protection payments from the debtor.

Numerous unpaid material suppliers filed motions requesting that the court clarify the extent of the automatic stay and determine whether they would be precluded from filing and serving post-petition notices, and thus perfecting their liens. On March 14, 2012, the court entered an order allowing the material suppliers to serve notice of, and thereby perfect, their liens post-petition as a permitted exception to the automatic stay. Multiple claims of lien were then filed by subcontractors. The consequence of such filings was that the liens of the materialmen took priority over BB&T's liens under North Carolina law. BB&T appealed the March 14, 2012 order. The United States District Court for the Eastern District of North Carolina and the Fourth Circuit subsequently affirmed the bankruptcy court order.

It became apparent that the amount of accounts receivable scheduled by the debtor as being subject to BB&T's security interest did not include the impact of the potential subcontractor lien priorities. BB&T hired an independent auditor to determine the value of BB&T's interest in the debtor's accounts receivable, who opined that the actual value of BB&T's interest in the accounts receivable as of the petition date, assuming a first priority position, was the lesser of $1,279,788 or the amount of its outstanding loan balance at the time. See Aff. of Andrea Lundquist ¶ 10, ECF No. 1877. After conducting a field examination on or about February 12, 2012, the auditor reached the $1,279,788 value by starting with a total accounts receivable balance of $4,080,306 as of February 8, 2012,[2] and deducting from that balance the following "ineligible" items: accounts receivable over

---

[2] The auditor's affidavit does not specifically state the source of the $4,080,306 figure, but does generally state that for each field examination, the auditor met with and received information from debtor's representatives for use in preparing the reports, including a detailed breakdown of accounts receivable. See Lundquist Aff., ECF No. 1877.

90 days old, an offset account, joint check values, bonded jobs, and retainage. According to the auditor's affidavit, however, this amount did not account for "[l]iens, potential liens and disputed liens;" the auditor later evaluated the impact on receivables if such amounts were considered, and determined that the value of net accounts receivable would have been $797,428 if these amounts were excluded, however the operative date of this revised determination is unclear from the report.[3] Nevertheless, in April of 2012, the auditor was asked to conduct a second analysis of debtor's accounts receivable in light of the court's March 12, 2012 order allowing materials suppliers to perfect their liens. In her second report, the auditor determined that the net value of accounts receivable as of April 18, 2012 was $286,102. This value was determined based on a starting accounts receivable balance of $5,502,176 as of March 31, 2012, and then deducting the same "ineligible accounts receivable items" as in the initial report, with an additional deduction of $412,935, representing "filed subcontractor priming liens."[4] Aff. of Andrea Lundquist ¶ 16, ECF No. 1877. The auditor's affidavit concludes with her opinion that after taking into account the existence of subcontractor priming liens, aged receivables, and other ineligible receivables, the value of BB&T's interest in debtor's accounts receivable was $286,102 as of March 31, 2012. Aff. of Andrea Lundquist ¶ 18, ECF No. 1877. This figure is exclusive of the real and other personal property subject to BB&T's security interest. In accordance with the debtor's schedules, that

---

[3] The affidavit indicates that this figure was calculated as of "3/31/14." Lundquist Aff. ¶ 12, ECF No. 1877. However, given that the affidavit refers to a second report prepared in April, 2012, which resulted in a determination of a far lesser value, and no reports were prepared in 2014, the affidavit most probably contains a typographical error regarding the timing of the $797,428 valuation. Because it is provided after the initial valuation and before the valuation from the second report, it appears to be attributable to either February 2012 or some point in between February and March of 2012.

[4] The auditor's affidavit further provides that "[i]nformation on the amounts of potential and filed subcontractor liens" was provided by the debtor.

additional collateral was valued at $1,087,000 ($1,050,000 for real property, and $37,000 for vehicles), plus other miscellaneous business assets.

On October 1, 2012, the case was converted to chapter 7 upon the debtor's filing of a notice of conversion pursuant to §1112(a). Stephen L. Beaman was subsequently appointed as the chapter 7 trustee. After conversion, the trustee took steps to liquidate the assets of the estate and pay creditors. The trustee has paid to BB&T its total amount of principal and interest owing on the petition date of $1,265,868.55. BB&T has also been paid an additional $34,868.24, which appears to have been applied towards post-petition interest.[5]

On October 31, 2013, BB&T filed an application for approval of an administrative claim pursuant to 11 U.S.C. § 507(b), in the amount of $813,850.97. On December 1, 2014, the court conducted a hearing on the application, during which counsel for BB&T indicated that after accounting for adequate protection payments and distributions from the trustee since the filing of the motion, the amount sought as an administrative claim was $156,382.04. At the conclusion of the hearing, the court allowed the parties the opportunity to file memoranda of law in support of their positions and BB&T the opportunity to file an application under §506(b) for attorneys' fees and post-petition interest. On January 16, 2015, BB&T filed its application for attorneys' fees and post-petition interest pursuant to § 506(b), seeking $167,762.21 in attorneys' fees and costs, as well as post-petition interest at the non-default contractual rate. In addition, in its post-hearing

---

[5] BB&T has received payments and distributions in the total amount of $1,300,736.79 as follows: (a) $62,900 in adequate protection payments from the debtor; (b) $143,379.20 disgorged by the IRS and paid over to BB&T, pursuant to the order entered on March 26, 2014; (c) $640,297.86 in net sale proceeds from the real property and the 2008 Dodge; (d) $284,033.91 collected and paid over by the trustee consisting of accounts receivable proceeds, pursuant to the consent order entered on April 10, 2014 allowing disbursement of funds to BB&T; and (e) $170,125.82, representing a final disbursement of receivable proceeds to BB&T, pursuant to the order entered on February 3, 2015.

memorandum, BB&T further modified the amount requested as an administrative claim to $229,671.86. Finally, during the second hearing in this matter on April 21, 2015, counsel for BB&T stated that the amount sought as a superpriority administrative claim is $232,513.86. Counsel explained that this amount consists of attorneys' fees of roughly $170,000 and post-petition interest of roughly $96,000. After the the April 21, 2015 hearing, the parties jointly submitted a summary of BB&T's fees and expenses, indicating that BB&T seeks the $167,762.21 requested in its fee application, plus an additional $2,842 for expenses associated with its auditor's court preparation and attendance.[6] Thus, after adding together the $167,762.21 in attorneys' fees/costs, $2,842 in auditor costs, and $96,777.89 in post-petition interest,[7] BB&T seeks an administrative claim of $232,513.86, consisting solely of attorneys' fees/costs and post-petition interest.

BB&T contends it is entitled to a superpriority administrative expense claim pursuant to 11 U.S.C. § 507(b), because the adequate protection provided by the debtor to BB&T during the chapter 11 was inadequate. The attorneys' fees and costs BB&T seeks to recover were incurred during the

---

[6] The summary further includes a categorization of the fees and expenses as follows, and indicates that the trustee objects to the inclusion of the auditor expenses, but if allowed, they would be categorized as post conversion expenses; additionally, the summary provides that $84,432.70 of the fees and expenses set forth below were incurred in relation to appeals of the "lien order" to the District Court and Fourth Circuit:

|                 | Pre-petition | Chapter 11  | Chapter 7   | Totals       |
|-----------------|--------------|-------------|-------------|--------------|
| Attorneys' Fees | $3,205.45    | $68,640.14  | $86,373.29  | $158,218.88  |
| Expenses        | $172.61      | $3,907.20   | $5,463.52   | $9,543.33    |
| Total           | $3,378.06    | $72,547.34  | $91,836.81  | $167,762.21  |

[7] See Memorandum in Support of Application for Allowance of Administrative Expense Claim, Doc. No. 1877, ¶ 23.

course of both the chapter 11 and chapter 7 case. The trustee asserts that BB&T is only entitled to post-petition interest and attorneys' fees to the *extent* it was an oversecured creditor. According to the trustee, after liquidating BB&T's collateral, paying BB&T's claim in full and paying fees permitted under § 506(c), sales proceeds of $34,868.24 remained. This remaining amount has already been paid to BB&T. As such, the trustee contends that BB&T should not be permitted any additional post-petition interest or attorneys' fees above the $34,868.24. The trustee also requests that in the event the court finds that notwithstanding §506(b), BB&T is entitled to attorneys' fees based on the underlying loan documents and State law, that the requested fees be denied as unreasonable. Lastly, the trustee asserts that BB&T's post-petition interest, attorneys' fees and costs should not be entitled to a superpriority status as BB&T has failed to show that it is entitled to priority under §507(b).

## DISCUSSION

A.   Allowance of Post-Petition Interest, Attorneys' Fees and Costs as Part of Secured Claim

BB&T asserts it is entitled to add post-petition interest in the amount of $96,777.89 and post-petition attorneys' fees and costs in the amount of $167,762.21 to its secured claim.[8] Generally, interest stops accruing when the bankruptcy petition is filed. *See* 11 U.S.C. § 502(b)(2). An exception applies, however, to oversecured creditors, pursuant to § 506(b). Section 506(b) provides:

> [t]o the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

---

[8] See Motion to Allow Attorney Fees, Costs, and Post-petition Interest Pursuant to 11 U.S.C. § 506(b), Doc. No. 1861. Although these are the amounts stated in the motion, BB&T additionally seeks $2,842 in auditor expenses according to the jointly submitted post-hearing summary of fees and expenses and the total claim amount provided at the second hearing.

11 U.S.C. § 506(b).

Section 506(b), as set forth above, is also the only means within the Bankruptcy Code in which a secured creditor is entitled to post-petition attorneys' fees. See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 373 (1988). Pursuant to this section, an oversecured creditor is entitled to collect reasonable fees, costs, or charges from the assets of the estate, if those fees or charges are provided for under the agreement or State statute under which the claim arose. To recover fees under § 506(b), the creditor has the burden of showing that: (a) it is an oversecured creditor; (b) the underlying agreement provides for such fees and costs; and (c) the fees and costs are reasonable and necessary. In re McCormick, 417 B.R. 372, 374-75 (Bankr. M.D.N.C. 2008) (citation omitted).

The court must first ascertain whether BB&T is oversecured. The Bankruptcy Code, and especially §506(b), is silent as to a particular point in time the collateral should be valued for the purpose of determining whether the creditor is oversecured. If the focus is on the valuation on the petition date, the evidence in the record indicates that BB&T was an oversecured creditor on that date. According to the auditor's initial report, the value of the accounts receivable subject to BB&T's security interest was $1,279,788 as of February 8, 2012, approximately 2 weeks after the petition date. In addition, the auditor's second report reflects that just two months after the petition date, and once potential materialman lien amounts were deducted, the value was $286,102. When those figures are added to the value of the personal property and real property as scheduled by the debtor, the total collateral value ranged from $1,373,102 to $2,366,788 – approximately $107,324 to $1,100,920 more than BB&T's proof of claim. However, under the circumstances presented in this case, petition date valuation is not the proper indicator. The Fourth Circuit in Ford Motor Credit

Co. v. Dobbins, 35 F.3d 860 (4th Cir. 1994) addressed the issue of when collateral should be valued to determine whether a creditor is oversecured and held that when collateral is actually sold during the pendency of the case and the terms of the sale are fair and the result of an arm's-length transaction, the court should use the sale price and not some earlier hypothetical valuation, to determine whether a creditor is oversecured and thus entitled to post-petition interest under § 506(b). In Ford Motor Credit, the chapter 11 individual debtors filed for bankruptcy relief and their chapter 11 plan was subsequently confirmed. The plan provided that the debtors were to sell the creditor's collateral by a certain date and disburse the proceeds to the creditor or the debtors would be in default and the creditor could take possession of the collateral.  The debtors were unable to sell the property and the bankruptcy court lifted the stay to allow the creditor to sell the property.  The property was sold almost six years after the petition date at a private sale.  The court approved the sale over the debtors' objection that the price was too low.  Following the sale, the creditor filed an amended proof of claim seeking post-petition interest, legal fees and expenses.  Citing to Collier on Bankruptcy, the Fourth Circuit ruled that the court should use the sale price to determine whether a creditor is oversecured, when the terms of the sale are fair and the result of an arm's-length transaction.  Id. at 870; Collier on Bankruptcy ¶ 506.03[6][b] at 506-43 (15th ed. rev. 2007) ("regardless of the purpose of the valuation, if an actual sale (or equivalent disposition) is to occur, the value of the collateral should be based on the consideration to be received by the estate in connection with the sale, provided that the terms of the sale are fair and were arrived at on an arm's-length basis.").  The Fourth Circuit further noted that §506(b) provides that when determining the value of secured collateral, the court should subtract any recovery under § 506(c), which provides that the trustee may recover from secured property "the reasonable, necessary costs and expenses of . . . *disposing of*, such property . . . ." Ford Motor Credit, 35 F.3d at 870 (citing 11 U.S.C. 506(c)

9

(emphasis added)). "A valuation of collateral which is sold, therefore, must necessarily be made at the time of the sale, since the first deductions from the sale proceeds to determine value are the costs of sale." Id. (citing In re Broomall Printing Corp., 131 B.R. 32, 34 (Bankr. D. Md. 1991)). The court has previously allowed the trustee's attorneys' fees incurred in assisting in the collection of BB&T's claim in the amount of $54,813.40, pursuant to § 506(c).

Here, the court will value the collateral at the time of the sales in accordance with Ford Motor Credit Company. After liquidating BB&T's collateral, paying BB&T's petition date claim, and paying fees permitted under §506(c), sale proceeds of $34,868.24 remain. Accordingly, BB&T is deemed oversecured and entitled to post-petition interest and attorneys' fees pursuant to §506(b). However, the post-petition interest and/or attorneys' fees cannot exceed the value of the collateral. "This section allows the holder of a secured claim to add post-petition interest and reasonable post-petition attorneys' fees to the secured claim to the extent of the value of the collateral." In re Croatan Surf Club, LLC, No. 11-00194-8-SWH, 2012 WL 1906386, at *6 (Bankr. E.D.N.C. May 25, 2012). As such, the court will allow BB&T post-petition interest and/or attorneys' fees in the amount of $34,868.24, which amount has already been paid to BB&T. In re Broomall, 131 B.R. 32, 37 (Bankr. D. Md. 1991) (holding that once an equity cushion is eliminated, an oversecured creditor becomes undersecured and no longer entitled to a claim for accruing interest). In re Croatan Surf Club, LLC, No. 11-00194-8-SWH, 2012 WL 1906386 at *7 (Bankr. E.D.N.C. May 25, 2012) (holding that no unsecured claim is created for the post-petition fees sought; rather, the fees are disallowed.). Accordingly, the court denies BB&T's request for additional interest and attorneys' fees pursuant to § 506(b).

B. <u>Priority Claim Under § 507(b)</u>

Next, BB&T seeks a superpriority administrative expense claim under § 507(b), asserting that the adequate protection payments provided by the debtor were inadequate based on an alleged decline in the value of debtor's accounts receivable during the chapter 11 period. Section 507(b) provides:

> If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(2) of this section arising from . . . the use, sale, or lease of such property under section 363 of this title, . . . then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

11 U.S.C. § 507(b). A claim allowable under subsection (a)(2) of § 507 is defined as an allowed administrative expense under § 503(b), which includes the "actual, necessary costs and expenses of preserving the estate" sought by BB&T. 11 U.S.C. § 503(b)(1)(A); <u>see also</u> 11 U.S.C. § 507 (a)(2). "Essentially, § 507(b) grants a secured creditor a first priority claim to the extent that the debtor's use of the collateral diminishes its value." <u>In re Mendez</u>, 259 B.R. 754, 758 (Bankr. M.D. Fla. 2001). Superpriority is available only after a creditor meets a number of requirements. First, a creditor must establish that adequate protection was provided and later proved to be inadequate. Second, the creditor must have an administrative expense claim under § 503(b). Finally, the claim must have arisen from either the automatic stay of § 362, the use, sale, or lease of property under § 363, or the granting of a lien under § 364(d). <u>Ford Motor Credit</u>, 35 F.3d at 865. Further, "[t]he presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among the creditors. Thus, statutory priorities must be narrowly construed." <u>Id.</u> (citing <u>In re James Downing & Co.</u>, 94 B.R. 515, 519 (Bankr. N.D. Ill. 1998)). The party seeking superpriority status bears the burden of proving entitlement to a § 507(b) priority claim. See <u>Official Comm. of</u>

11

Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC), 501 B.R. 549, 590-91 (Bankr. S.D.N.Y. 2013).

In its § 507(b) application, BB&T requests a claim "equal to the decrease in value of its interest in accounts receivable during the debtor-in-possession period, but not greater than the amount of its allowed claim."[9]  Application for Allowance of Administrative Expense Claim, pg. 4, Doc. No. 1491.  At the same time, BB&T asks for a § 507(b) claim consisting solely of "reasonable attorney's fees and post-petition interest," as its principal balance, interest, and late fees as of the petition date have been paid in full.  Memorandum in Support of Application for Allowance of Administrative Expense Claim, pg. 2, Doc. No. 1877.  To start the § 507(b) analysis, the court will first determine whether BB&T's claim constitutes an administrative expense pursuant to § 503(b).  Administrative expenses allowable under § 503(b) are "the actual, necessary costs and expenses of preserving the estate . . ."  11 U.S.C. § 503(b)(1)(A).  The terms "actual" and "necessary" must be viewed narrowly, as "[§] 503(b)(1)(A) was not intended to 'saddle debtors with special post-petition obligations lightly or give preferential treatment to certain select creditors by creating a broad category of administrative expenses.'"  In re Mid-Region Petroleum, 1 F.3d 1130, 1134 (10th Cir. 1993) (citation omitted).  The Code "requires actual use of the creditor's property by the debtor, thereby conferring a concrete benefit on the estate before a claim is allowable as an administrative expense."  In re ICS Cybernetics, Inc., 111 B.R. 32, 36 (Bankr. N.D.N.Y. 1989) (citation omitted).

---

[9] The application identifies the total claim as $1,455,748.83, based on a statement that BB&T is entitled to attorneys' fees in the amount of 15% of its claim under North Carolina law and the loan documents.  However, in its fee application filed after the initial hearing in this matter, BB&T states that the attorneys' fees sought are less than 15% of the claim amount by approximately $20,270.77.  Motion to Allow Attorney Fees, Costs, and Post-Petition Interest Pursuant to 11 U.S.C. § 506(b), pg. 5, Doc. No. 1861.

12

The debtor's use of BB&T's collateral was a necessary facet of the debtor's plan to reorganize, particularly during the beginning of the debtor's case. On March 14, 2012, however, the court entered an order allowing materialmen to perfect liens as an exception to the automatic stay. After the lien order was entered a large portion of the accounts receivable were used to pay materialmens' liens. Once the case was converted to a chapter 7 proceeding on October 1, 2012, the chapter 7 estate did not benefit from the use of the creditor's collateral. Upon conversion of the case, the trustee took steps to facilitate an orderly liquidation of the debtor's assets, some of which was BB&T's collateral. Merely marketing collateral is not the "type of concrete, actual benefit contemplated by § 503(b)(1)(A)." Id. at 866-67. At the very least, the use of BB&T's interest in the debtor's accounts receivable after conversion is not a proper § 503 expense.

As to the debtor's use of BB&T's cash collateral pre-conversion, i.e., while in chapter 11, even if the debtor's use of its accounts receivable gave rise to a § 503(b) claim, BB&T will hold that claim only to the extent that adequate protection has failed. See In re Colter, Inc., 53 B.R. 958, 960 (Bankr. D. Colo. 1985). In other words, and as the Fourth Circuit held in Grundy National Bank v. Rife, 876 F.2d 361, 363-64 (4th Cir. 1989), a case on which BB&T relies, "§ 507(b) converts a creditor's claim *where there has been a diminution in the value of a creditor's secured collateral by reason of a § 362 stay* into an allowable administrative expense claim under § 503(b)." (Emphasis added.) In Grundy, for example, a chapter 13 debtor used the vehicle that served as security for the creditor's claim for 9 months without making any payments to the creditor. The debtor then decided to surrender the vehicle, which had depreciated significantly and would no longer run. The court granted the creditor an administrative expense claim for the missed payments or the diminution in value of the vehicle, whichever amount was greater, with interest.

13

The problem for BB&T is that it does not assert an actual loss such as missed adequate protection payments, or a deficiency after selling worthless collateral. Instead, BB&T essentially asserts a claim for its inability to collect its post-petition interest and attorneys' fees. In this case, BB&T recovered the full amount of its claim as of the petition date, consisting of principal, interest and miscellaneous fees. BB&T sought post-petition interest and attorneys fees pursuant to § 506(b), which the court is awarding to the extent the value of the collateral upon sale exceeded the amount of BB&T's claim. BB&T has provided no basis upon which it can claim entitlement under §§ 503 and 507 to the same remaining attorneys' fees and interest that it is not entitled to under § 506(b).

In Baybank-Middlesex v. Ralar Distributors, Inc., 69 F.3d 1200 (1st Cir. 1995), a case with similar facts to the one at hand, the debtor's payments during post-petition operations along with the proceeds of a foreclosure sufficiently repaid all of the primary creditor's loan principal, pre-petition interest, and an unspecified amount of post-petition interest. The creditor sought a § 507(b) superpriority claim, contending that had its collateral been adequately protected, the foreclosure proceeds would have covered the post-petition interest and fees. This creditor, however, was undersecured, precluding the possibility of any post-petition interest or fees. Nevertheless, the court discussed the creditor's claim for failure of adequate protection, noting that despite stating it suffered a loss, the creditor failed to present the nature or extent of the claimed loss. The court held that even if the creditor had established a failure of adequate protection, it had no claim arising from the confines of the automatic stay because it recovered what it was entitled to as an undersecured creditor – its pre-petition claim and no more. The court even posited that the debtor's use of the collateral likely benefitted the creditor, allowing it a full recovery of its pre-petition claim despite being undersecured initially.

Likewise, BB&T has recovered exactly what it is entitled to as a partially oversecured creditor: principal, interest, and various fees totaling $1,265,868.55, the full amount of its pre-petition claim, as well as a portion of its post-petition interest and/or attorneys' fees in the amount of $34,868.24. BB&T has not established any entitlement to additional post-petition interest or attorneys' fees, nor did it establish a decline in the value of the debtor's accounts receivable. Despite its own auditor's assessed value of the accounts receivable at $286,102 just two months after the petition date, BB&T received distributions totaling $454,159.73 from accounts receivable during the case. Thus, BB&T has not established that its adequate protection proved to be inadequate. Additionally, BB&T has not shown that its claim arose *solely* as a result of the use of its collateral or the imposition of the automatic stay. In re Mendez, 259 B.R. 754, 758 (Bankr. M.D. Fla. 2001). "[L]osses that would have occurred despite the interference of the bankruptcy case are not entitled to protection under § 507(b)." Id. at 758. The court appropriately found that BB&T was adequately protected by the value of its collateral on the petition date and on the date of the entry of the first interim order authorizing the use of cash collateral. Subsequent to those dates, BB&T's priority position in the debtor's accounts receivable was successfully challenged. The court's order of March 14, 2012, which allowed subcontractors to file claims of liens on funds as an exception to the automatic stay resulted in a "devaluation" of BB&T's interest in accounts receivable. These "losses" would have been incurred despite the interference of the bankruptcy case, because subcontractors had the right to file materialmen's liens outside of bankruptcy which would have taken priority over BB&T's lien. Therefore, it was not the **use** of the accounts receivable that caused BB&T's inability to recover its post-petition interest and attorneys' fees, it was the reassessment of their actual value and consideration of their reduced priority status. As such, BB&T has not met its

burden of proof with respect to the application for a superpriority administrative expense claim pursuant to § 507(b).

## **CONCLUSION**

The court will allow BB&T post-petition interest and/or attorneys' fees in the amount of $34,868.24, which amount has already been paid to BB&T pursuant to § 506(b). The court, however, denies BB&T's request for its claim to be treated as a superpriority claim pursuant to § 507(b).

**SO ORDERED.**

**END OF DOCUMENT**