IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:15-CV-434-FL

| | | |
|---|---|---|
| *In re*: | ) | |
| | ) | |
| CONSTRUCTION SUPERVISION | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Debtor, | ) | |
| _____ | ) | |
| | ) | |
| BRANCH BANKING AND TRUST | ) | |
| COMPANY, | ) | ORDER |
| | ) | |
| Appellant, | ) | |
| v. | ) | |
| | ) | |
| STEPHEN L. BEAMAN, *in his* | ) | |
| *capacity as Chapter 7 Trustee for* | ) | |
| *Construction Supervision Services, Inc.*, | ) | |
| | ) | |
| Appellee. | ) | |

This matter is before the court on appeal by Branch Banking and Trust Company ("BB&T") from an order of the United States Bankruptcy Court for the Eastern District of North Carolina denying BB&T's motion for a "superpriority" administrative expense claim, made pursuant to 11 U.S.C. § 507(b); and BB&T's motion for post-petition interest, costs, and fees, including reasonable attorney's fees, made pursuant to 11 U.S.C. § 506(b). See generally *In re* Const. Supervision Servs., Inc., No. 8:12-BK-569-SWH, 2015 WL 4873062 (Bankr. E.D.N.C. Aug. 13, 2015). The issues raised have been briefed fully and are ripe for ruling. For the reasons that follow, the court affirms.

# BACKGROUND

A.     Preliminary Proceedings in the Bankruptcy Court

On January 24, 2012 (sometimes the debtor's "petition date"), debtor, Construction Supervision Services, Inc., filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, seeking reorganization.   BB&T filed four claims against the estate totaling $1,265,868.55 in principal debt and matured interest as of the petition date.  (DE 14-1 through 14-5). Those claims were secured by certain security agreements, a UCC financing statement, and a deed of trust.  As relevant to this case, BB&T held a security interest in the debtor's accounts receivable, which were valued at $5,514,574.50 as of the petition date.  (DE 7-1, 15–16).  Those accounts receivable were aged as follows:

| | |
|---|---|
| 0 - 30 days | $1,165,382.87 |
| 31 - 60 days | $1,371,916.34 |
| 61 - 90 days | $479,687.78 |
| 90 - 120 days | $26,966.57 |
| 121+ days | $829,661.20 |
| Retainage[1] | $2,479,636.17 |
| Adjustments | ($838,676.43)[2] |
| Total | $5,514,574.50 |

---

[1]  "Retainage" is a "percentage of what a landowner pays a contractor, withheld until the construction has been satisfactorily completed and all mechanic's liens are released or have expired."  Another phrase for "retainage" is "retained funds."  Retainage, Black's Law Dictionary (10th ed. 2014)

[2]  The debtor's Chapter 11 petition evidences payments on accounts receivable in the amount of "838,676," occurring, apparently, between the date on which the debtor's accounts receivable information was printed, January 13, 2012, and the petition date.  (DE 7-1, 16) (referencing "JC's/Cash rec'd Last Week").  The $838,676.43 figure used above represents the difference between accounts receivable of all ages, plus retainage, minus total accounts receivable, which was provided in the petition by the debtor.

2

Also on January 24, 2012, the debtor filed a emergency motion requesting the authority to use the cash collateral in its possession to assist in its reorganization efforts, pursuant to 11 U.S.C. § 363 (the "first cash collateral motion").[3]  (DE 7-2).  The debtor admitted that it owed at least $1,236,107.00 to BB&T; however, it contended that it was entitled to use its cash collateral because BB&T's debt was secured by property "valued far in excess of the [debtor's] obligation."  (Id., 2).  On January 26, 2012, BB&T opposed the debtor's first cash collateral motion and argued that its interest in the debtor's cash collateral, specifically its interest in the debtor's accounts receivable, was not "adequately protected," because "a substantial portion of the Debtor's accounts receivables are aged beyond 60 days or consist of retainage."  (DE 7-3, 3).  In the alternative, BB&T argued that, if the court were to grant the debtor's motion, it was entitled to monthly adequate protection payments to preserve its interest in the debtor's cash collateral.  (Id.).

The bankruptcy court immediately conducted a hearing on the debtor's first cash collateral motion and, on January 31, 2012, granted the motion.  (DE 8-1, 4–9).  However, the bankruptcy court found that BB&T's interest in the debtor's accounts receivable was not adequately protected and ordered the debtor to "make an adequate protection payment to BB&T in the amount of $5,000 by February 15, 2012."  (Id., 6).  In addition, the bankruptcy court stated that "[t]o the extent that the adequate protection granted to . . . BB&T herein is insufficient, . . . BB&T shall be entitled to priority under 11 U.S.C. § 507(b)."  (Id., 7).

---

[3]  "Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest."  11 U.S.C. § 363(a).  "Cash collateral" also includes "the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case [under the Bankruptcy Code]." Id.

3

Between January 31, 2012, and September 14, 2012, the bankruptcy court granted eight additional cash collateral motions. However, each time, the court also found that BB&T was not "adequately protected." (See DE 9-1, 22, 209, 268; DE 10-1, 18, 56, 134; DE 11-1, 5, 39). The court ordered the debtor to pay to BB&T adequate protection payments in various amounts, ranging from $5,000.00 to $10,000.00. The debtor's adequate protection payments totaled $62,900.00 over the relevant period.

B.     Intervening Senior Liens

Meanwhile, by March 2012, various subcontractors and material providers (collectively "subcontractors") had filed claims against the debtor's estate. These subcontractors admitted that they had not perfected their various liens against the debtor, but, nevertheless, argued they had a sufficient "interest" in estate's property such that an exception to the bankruptcy code's automatic stay provision allowed them to perfect that interest post-petition. See generally 11 U.S.C. § 362(a)(4) (bankruptcy stays creditor's ability to perfect a lien in property); §§ 362(d)(3) & 546(b) (allowing limited exception to § 362(a)(4), where certain creditors have a pre-petition "interest in property" arising under state law). On March 14, 2012, over BB&T's objection, the bankruptcy court allowed the subcontractors to serve the debtor with notice and thereby perfect their security interests. See In re Constr. Supervision Servs., Inc., 8:12-BK-569, 2012 WL 892217, at *1 (Bankr. E.D.N.C. Mar. 14, 2012), aff'd sub nom. Branch Banking & Trust Co. v. Constr. Supervisions Servs., Inc., (In re Constr. Supervision Servs., Inc.), 753 F.3d 124 (4th Cir. 2014). These liens were given priority over BB&T's secured claim in the debtor's accounts receivable under North Carolina law. See generally N.C. Gen. Stat § 44A–18.

4

C.       Conversion, Payment of BB&T's Claim, and Subsequent Expense Litigation

From January 31, 2012 until October 1, 2012 (the "debtor-in-possession period"), the debtor used its accounts receivable to assist in its attempted reorganization. Between February 2012 and July 2012,[4] the debtor made both credits and debits to its accounts receivable. As a result, the value of the debtor's accounts receivable, in which BB&T and the various subcontractors held perfected security interests, fluctuated. For example, in February 2012, the value of the debtor's accounts receivable reached its apex, $4,724,222.00. Later, in July 2012, the value of the debtor's accounts receivable reached its lowest point, $4,065,457.86. However, no discernable downward trend was evident over the relevant period of time.

On October 1, 2012, the bankruptcy court entered an order not approving the debtor's disclosure statement and supplemental disclosure statement, pursuant to 11 U.S.C. § 1125, thereby impairing the debtor's ability to propose a successful plan of reorganization. (See DE 11-1, 62–72). Following this setback, also on October 1, the debtor voluntarily converted this case to one under Chapter 7 of the bankruptcy code, seeking liquidation of its assets. (Id., 60). On October 5, 2012, appellee, Stephen L. Beaman (the "Trustee"), was appointed the Chapter 7 Trustee for this case. (Id., 73). Over approximately the next year, the Trustee liquidated the debtor's assets. That liquidation brought BB&T, in addition to the $62,900.00 in adequate protection payments received from the debtor, $1,237,836.79, resulting in a total of $1,300,736.79 paid to BB&T from the debtor's estate. That amount exceeded BB&T's petition date claim by $34,868.24, leaving it with an "equity

---

[4]  The record includes monthly financial statements filed in the bankruptcy court by the debtor. These financial statements cover the time period from January 2012 until July 2012. However, as discussed more fully herein, the debtor's reorganization attempts persisted even after July 2012.

cushion" of that amount.[5]  BB&T applied its equity cushion toward its post-petition interest, costs, and fees, including attorney's fees.  11 U.S.C. § 506(b).

On October 31, 2013, BB&T filed a motion in the bankruptcy court requesting a superpriority administrative expense claim for up to the value of its post-petition interest, costs, and fees (the "superpriority motion," which requested a "superpriority claim"), pursuant to 11 U.S.C. § 507(b).  BB&T argued that it was entitled to a superpriority claim for those expenses, where the debtor's use of its accounts receivable during the debtor-in-possession period diminished the value of those accounts such that BB&T no longer had an adequate equity cushion from which it could recover fully its expenses allowed under § 506(b).  On December 1, 2014, the bankruptcy court held a hearing on BB&T's superpriority motion.  At the conclusion of that hearing, the bankruptcy court allowed BB&T and the Trustee to file supplemental briefs on the issue, and further allowed BB&T to file a motion for post-petition interest, costs, and fees (its "expense motion"), pursuant to 11 U.S.C. § 506(b).  BB&T file its expense motion on January 16, 2015.

Following a second hearing, the bankruptcy court denied both motions by the instant order on appeal, entered August 13, 2015.  *In re* Constr. Supervision Servs., 2015 WL 4873062.  On BB&T's expense motion, the bankruptcy court held that BB&T already had applied its full equity cushion toward expenses.  The bankruptcy court reasoned that BB&T's equity cushion was the aggregate liquidation value of each item of property in the debtor's estate in which BB&T held an

---

[5] An "equity cushion" is the amount by which the value of the collateral securing the debtor's obligation exceeds the creditor's interest in the collateral.  See Bray v. Shenandoah Fed. Sav.& Loan Ass'n (*In re* Snowshoe Co.), 789 F.2d 1085, 1088–89 (4th Cir. 1986).  A creditor with an equity cushion is referred to as an "oversecured" creditor.  By contrast, if a creditor's interest in property is greater than the amount of collateral, that creditor is "undersecured."  If a creditor's interest in the collateral matches the value of the collateral, that creditor is "fully secured."

interest minus the value of BB&T's claim and expenses allowed to the Trustee under § 506(c), or $34,868.24. That amount equaled the amount BB&T already had applied to its expenses.

The bankruptcy court also denied BB&T's superpriority motion, holding, in effect, that BB&T could not use a superpriority claim to accomplish that which it could not do under § 506(b), recoup its post-petition interest, costs, and fees from a depleted equity suchion. In principal, the court held that BB&T could not show that its court-ordered adequate protection was inadequate because BB&T recovered fully the principal debt and matured interest owed to it as of the petition date. In addition, the bankruptcy court held that BB&T failed to establish that the diminution in value of the collateral securing the debtor's obligation was attributable solely to the debtor's use of that property rather than the intervening subcontractors' liens.

BB&T timely appealed the bankruptcy court's order, pursuant to Federal Rule of Bankruptcy Procedure 8003. This court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

## COURT'S DISCUSSION

A.    Standard of Review

This court reviews the bankruptcy court's legal determinations de novo. Ford Motor Credit Co. v. Reynolds & Reynolds Co. (In re JKJ Chevrolet, Inc.), 26 F.3d 481, 483 (4th Cir. 1994). The court reviews the bankruptcy court's findings of fact for clear error. Green v. Staples (In re Green), 934 F.2d 568, 570 (4th Cir. 1991). A finding of fact is "clearly erroneous" when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985).[6]

---

[6] Unless otherwise noted, all internal alterations, citations, and quotations have been omitted.

B.      The Bankruptcy Court Appropriately Denied BB&T's Superpriority Motion

The first issue on appeal is whether BB&T may rely on a superpriority claim to recoup its petition date equity cushion insofar as that equity cushion no longer exists in an amount sufficient to cover all of BB&T's post-petition interest, costs, and fees where BB&T otherwise would be entitled to such expenses, but where it recovered fully the principal debt and matured interest owed to it as of the petition date.  As set forth below, the court holds that BB&T may not recoup its equity cushion for the purpose of recovering such expenses through a superpriority claim.  The adequate protection payments provided to BB&T were not "inadequate," where BB&T recovered fully the principal debt and matured interest owed to it as of the petition date.

In the alternative, the court holds that BB&T failed to show it was entitled to a superpriority claim in light of the intervening subcontractors' liens.  BB&T did not demonstrate that the collateral securing the debtor's obligation declined in value as a result of the debtor's beneficial use of such collateral during the debtor's Chapter 11 case.  Moreover, BB&T is not entitled to recovery in the form of a superpriority claim for any diminution in the value of the collateral securing the debtor's obligation that occurred following the debtor's conversion of its case.

1.      Statutory Framework

The purpose of a "superpriority" claim may be summarized as follows. In certain circumstances, a creditor, the value of whose petition date secured claim is negatively affected by the trustee or debtor's use of the collateral securing the debtor's obligation, may be granted a "first priority" claim, senior to all but a select few other claims, to recoup its petition date secured claim up to the petition date value of principal debt and matured interest owed to it by the debtor.  See generally Collier on Bankruptcy ¶507.14 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); see

8

also generally § 507(a)(2) & (b). The requirements for a superpriority claim are governed by the bankruptcy code. Section 507(b) provides:

> If the trustee [or debtor-in-possession], under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under [11 U.S.C. § 507(a)(2)] arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

11 U.S.C. § 507(b).[7] The Fourth Circuit has distilled this statute into three requirements. See Ford Motor Credit Co. v. Dobbins (In re Dobbins), 35 F.3d 860, 865 (4th Cir. 1994). "First, adequate protection must have been provided previously, and the protection ultimately must prove to be inadequate." Id. "Second, the creditor must have a claim allowable under § 507(a)[(2)] (which in turn requires that the creditor have an administrative expense claim under § 503(b))." Id. "And third, the claim must have arisen from either the automatic stay under § 362; or the use, sale or lease of the collateral under § 363; or the granting of a lien under § 364(d)." Id.

    2.    The "Value" of BB&T's "Interest" in The Debtor's Accounts Receivable Was Adequately Protected

A superpriority claim first requires that the "value" of a creditor's "interest" in the collateral be impaired. See id.; see also §§ 363 & 361(1); United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 370–71 (1988). The relevant "interest" to be protected is the value of the creditor's "secured claim," as that concept is defined by § 506(a)(1). See Timbers, 484 U.S. at 371–72. Thus, the relevant "interest" to be protected is not necessarily the value of the collateral.

---

[7] Under Chapter 11, a "debtor in possession" is simply the debtor exercising dominion over its own property during reorganization. 11 U.S.C. § 1101(1). The debtor in possession has "all the rights, other than the right to compensation under [11 U.S.C. § 330], and powers, and shall perform all the functions and duties, except duties specified in [11 U.S.C. 1106(a)(2), (3), and (4)], of a trustee." 11 U.S.C. § 1107(a).

§ 506(a)(1); Grundy Nat'l Bank v. Rife, 876 F.2d 361, 364 (4th Cir. 1989); see also Grundy Nat'l Bank v. Tandem Mining Corp., 754 F.2d 1436, 1440–41 (4th Cir. 1985), abrogated on other grounds, Timbers, 484 U.S. 365.  Nor does the relevant "interest" include any "unsecured claim," as an "unsecured" claim does not represent an "interest . . . in property."  See Collier, supra ¶361.02[2] & n.8.

Under no circumstance may the "value" of creditor's "interest" to be adequately protected exceed the value of the principal debt and matured interest owed to the creditor as of the petition date.  See Orix Credit Alliance, Inc. v. Delta Res., Inc. (In re Delta Res., Inc.), 54 F.3d 722, 729–30 (11th Cir. 1995).  Generally, an oversecured creditor is allowed post-petition expenses, such as those listed in § 506(b), as part of its secured claim.  Unsecured Creditors' Comm. 82-00261c-11A v. Walter E. Heller & Co. (In re K.H. Stephenson Supply Co.), 768 F.2d 580, 583–84 (4th Cir. 1985).  However, such expenses are allowed only "to the extent" of the creditor's oversecurity.  § 506(b) (emphasis added); accord K.H. Stephenson, 768 F.2d at 583–84.  In the Fourth Circuit, as elsewhere, the extent of that oversecurity is gauged at or near the end of the case.  See Dobbins, 35 F.3d at 870; see also Delta Res., 54 F.3d at 729; United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.), 793 F.2d 1380, 1387 (5th Cir. 1986), panel opinion reinstated and aff'd on reh'g 808 F.2d 363 (5th Cir. 1987) (en banc), aff'd 484 U.S. 365 (1988).  Thus, including post-petition expenses in the basket of "interests" to be adequately protected is incongruent with the text and operation of the bankruptcy code.

Put differently, "adequate protection" payments ensure stability in the petition-date "value" of a creditor's "secured claim."  See Timbers, 484 U.S. at 372 (reasoning that the "value" of a creditor's "claim" in § 506(a)(1) and "value" of a creditor's "interest in property" in § 361 are the

10

same).  The value of that claim is the lesser of the value of the collateral or the principal debt and matured interest owed the creditor as of the petition date.  See § 506(a)(1); Timbers, 484 U.S. at 372 (stating that, in the case of an undersecured creditor, the "'value of [a] creditor's interest' . . . means 'the value of the collateral'"); see also S. Rep. No. 95–989, p. 68 (1978); H.R. Rep. No. 95–595, pp 181, 356 (1977).

Applied in the context of this case, BB&T, an oversecured creditor as of both the petition date as well as the date on which it requested adequate protection, was awarded adequate protection payments to compensate it in the event that the debtor's accounts receivable depreciated to such an extent that the value of the collateral sank below the value of the principal debt and matured interest owed to BB&T as of the petition date.  In the language of § 361 and § 506(a)(1), BB&T was awarded adequate protection to prevent any portion of its allowed, oversecured petition date claim from becoming unsecured.  See § 506(a)(1).  Had the debtor's adequate protection payments failed BB&T, BB&T would have become an undersecured creditor.  That did not happen here; thus, BB&T's superpriority motion appropriately was denied.

BB&T assumes that the "value" of its "interest" in the debtor's accounts receivable more properly is calculated as the value of those accounts receivable, either on the petition date or on the date its requested adequate protection payments.[8]  (Appellant's Br., DE 21, 18–23) (equating the decline in the value of BB&T's interest as the decline in the value of the debtor's accounts

---

[8]  The value of the "interest" to be adequately protected is set no later than the date on which any party petitions for relief from the automatic stay.  Compare In re Waverly Textile Processing, Inc., 214 B.R. 476, 479 (Bankr. E.D. Va. 1997) (holding value of creditor's interest to be protected is set on date the creditor petitions for relief from the automatic stay), with Lincoln Nat'l Life Ins. Co. v. Craddock-Terry Shoe Corp (In re Craddock-Terry Shoe Corp.), 98 B.R. 250, 255 (Bankr. W.D. Va. 1988) (holding value of creditor's interest to be protected set as of debtor's petition date).  However, as the court noted previously, that "value" is capped by the value of the creditor's petition date secured claim.  See Orix Delta Res., 54 F.3d at 729–30.

11

receivable).  This notion apparently comes from <u>Timbers</u>, where the Court, in dicta, defined the "value" of an "[undersecured] creditor's interest [in property]" as "the value of the collateral. <u>Timbers</u>, 484 U.S. at 372.  <u>See generally</u> <u>Brown & Co. Secs. Corp. v. Balbus (<i>In re</i> Balbus)</u>, 933 F.2d 246, 250–51 (4th Cir. 1991) (characterizing the relevant portion of <u>Timbers</u> as dicta). However, BB&T's assumption does not withstand scrutiny.  That definition does not make sense in every case.  In particular, it cannot be applied where the creditor is oversecured at the time the interest to be protected is valued, as BB&T was in this case.

For example, equating the value of an oversecured creditor's "interest" or "claim" in an item of collateral with the value of the collateral securing the debtor's obligation is inconsistent with the text of the bankruptcy code.  <u>See</u> <u>Anderson v. Hancock</u>, __ F.3d __, 2016 WL 1660178, at *3 (4th Cir. 2016) ("[The court must interpret the provisions of the bankruptcy code] as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions inconsistent, meaningless or superfluous.").  If the value of the collateral were the only germane consideration in assessing the value of a creditor's secured claim, much of § 506(b) would be superfluous; that statute refers separately to both the value of the oversecured creditor's claim and the value of the collateral.  <u>See</u> § 506(b).  If Congress had intended the value of a creditor's claim to be measured by the value of the collateral securing the debtor's obligation in every case it would have said so.

The bankruptcy code's legislative history also supports valuing differently an oversecured or fully secured creditor's claim, as opposed to an undersecured creditor's claim.  <u>See</u> <u>Anderson</u>, 2016 WL 1660178, at *4 (reasoning that the bankruptcy code's "legislative history . . . can sometimes give a clue to the meaning of the text," insofar as it "shows genesis and evolution").  The

legislative history is relatively clear that the value of an undersecured creditor's claim, and thus the "value" of its "interest" in the collateral securing the debtor's obligation, is the value of that collateral itself.  <u>See</u> H.R. Rep. No. 95–595, p. 180–81; <u>see also</u> § 506(a)(1) ("undersecured creditor has secured claim up to the value of the collateral securing the debtor's obligation).  The legislative history lauds the bifurcation of undersecured creditors' claims as a major advancement in bankruptcy law.  <u>See</u> H.R. Rep. 95–595, <u>supra</u>.  By contrast, the relevant legislative history never ties the "value" of an oversecured creditor's claim to the value of the collateral securing the debtor's obligation.

Moreover, if the value of an oversecured creditor's secured claim was equivalent to the value of the collateral securing the debtor's obligation, such a construction would lead to an absurd result. <u>See</u> <u>Stone v. Instrumentation Lab. Co.</u>, 591 F.3d 239, 243 (4th Cir. 2009) (noting courts should interpret statutes so as to avoid an "absurd result").  Under BB&T's view, an oversecured creditor always is entitled a superpriority claim to assist in the collection of its post-petition interest, costs, and fees where the debtor's post-petition use of the collateral depreciates its value, irrespective of whether that creditor has recovered fully the principal debt and matured interest owed to it as of the petition date.  However, such a construction unfairly impairs the ability of undersecured or unsecured creditors to recover on their claims; the unencumbered assets of the already depleted estate would need to be funneled toward the mounting post-petition interest, costs, and fees of the oversecured creditor in order to restore its equity cushion to an extent that allowed that creditor to recover its post-petition interest, costs, and fees.

In sum, BB&T is not entitled to a superpriority claim under § 507(b), because its adequate protection payments were not inadequate.  From January 31, 2012, until present, the value of

13

BB&T's secured claim was never altered.  Thus, as the bankruptcy court put it, BB&T "recovered exactly what it [was] entitled to . . . principal, interest, and various fees totaling $1,265,868.55, the full amount of its prepetition claim."  See <u>In re</u> <u>Constr. Supervision Servs.</u>, 2015 WL 4873062, at *7.  Accordingly, the court affirms the bankruptcy court's order insofar as it denied BB&T's superpriority motion.

> 3.    The Bankruptcy Court Did Not Err in Concluding BB&T Failed to Prove the Decline in The Value Of The Debtor's Accounts Receivable Was Attributable "Solely" To The Debtor's Use Of Those Accounts Or The Stay.

In any event, even assuming adequate protection is meant to protect the value of collateral in all cases, and thus, that BB&T was not adequately protected, the bankruptcy court still did not clearly err in denying BB&T's superpriority motion on the basis of the evidence before it.  In particular, BB&T failed to show that any decline in the value of the collateral securing the debtor's obligation prior to the debtor's conversion from Chapter 11 to Chapter 7 was attributable solely to the debtor's use of the property or the automatic stay for two interdependent reasons.  First, any decline in the value of the debtor's accounts receivable that occurred post-conversion cannot be recouped through a superpriority claim.  Second, BB&T's evidence failed to demonstrate that the debtor's accounts receivable had declined in value as of the date on which the debtor converted this case from Chapter 11 to Chapter 7.

14

a.    Any Depreciation in The Value of the Debtor's Accounts Receivable Following Conversion Is Not Subject to BB&T's Superpriority Claim Because Such Depreciation Did Not Result from The Debtor's Beneficial Use Of That Property

Before assessing the bankruptcy court's evidentiary ruling as to the cause of any decline in the value of the collateral securing the debtor's obligation to BB&T, the court must hone in on the relevant time period for purposes of BB&T's superpriority motion.

Upon the debtor's conversion of this case from Chapter 11 to Chapter 7, any arguable entitlement BB&T had to a superpriority claim was extinguished.  A superpriority claim only exists where the decline in the collateral's value is attributable to an administrative expense.  See §§ 507(a)(2) & 503; Dobbins, 35 F.3d at 866–67.  For present purposes, a debtor's use of the collateral securing its obligation to a creditor in order to pay the "actual, necessary costs and expenses of preserving the estate" is an "administrative expense."  § 503(b).  A superpriority claim to recover funds expended toward the "actual, necessary costs and expenses of preserving the estate," requires the "actual use of the creditor's property" and such use must confer a "concrete benefit on the estate."  Dobbins, 35 F.3d at 865–66 (citing In re ICS Cybernetics, Inc., 111 B.R. 32, 36 (Bankr. N.D.N.Y. 1989)).  However, "the mere opportunity to market collateral is [not] the type of concrete, actual benefit contemplated by § 503(b)."  Id. at 866–67.

Following the debtor's October 1, 2012, conversion, the collateral stopped "benefitting" the estate within the purview of § 503(b).  Any expenses arose from the trustee's attempts to market that collateral.  That benefit is insufficient to justify an award of administrative expenses.  Accordingly, BB&T is not entitled to recover for any diminution in the value of the collateral securing the debtor's obligation to it that occurred after the debtor converted this case to one under Chapter 7.

15

b.    BB&T Failed to Demonstrate that its Superpriority Claim Arose "Solely" from The Debtor's "Use" of the Collateral or the Automatic Stay

The bankruptcy court held that the dissipation of BB&T's interest in the collateral during the Chapter 11 case was not caused by the debtor's use of the collateral, or the stay, but, rather, that it was caused by the subcontractors' intervening liens.  BB&T argues that the bankruptcy court erred in holding that the decline in the value of the collateral securing the debtor's obligation was not attributable solely to the debtor's use of the collateral during the Chapter 11 case, notwithstanding the fact that the intervening subcontractors' liens negatively affected the value of the debtor's accounts receivable.  Put another way, BB&T argues that had the debtor not used its accounts receivable, BB&T would be able to recoup fully its post-petition interest, costs, and fees.

The bankruptcy court's findings of fact were not clearly erroneous.  The creditor must prove that the value of the collateral securing the debtor's obligation was impaired as a result of the debtor's "actual use" of that collateral.  <u>Dobbins</u>, 35 F.3d at 866, 869 & n.9; <u>Bonapfel v. Nalley Motor Trucks (<i>In re</i> Carpet Ctr. Leasing Co.)</u>, 991 F.2d 682, 689 (11th Cir. 1993) (assuming an "alleged impairment of value" must be attributable "solely" to one of the permissible reasons listed in § 507(b)); <u><i>In re</i> Second Timmon Hotel Co.</u>, 91 B.R. 985, 988 (Bankr. M.D. Fla. 1988); Collier, <u>supra</u> ¶507.14[1][c].  A decline in value resulting from some other influence is not recompensable. <u>Bankers Life Ins. Co. v. Alyucan Interstate Corp. (<i>In re</i> Alyucan)</u>, 12 B.R. 803, 809 (Bankr. D. Utah 1981).

Before the bankruptcy court, as here, BB&T relied extensively on two reports prepared by Andrea Lundquist ("Lundquist"), an analyst it hired to examine the value of the debtor's accounts receivable.  (<u>See</u> Lundquist Aff., DE 13-1, 6–10; <u>see also</u> Lundquist Initial Report, DE 12-1, 32–66; Lundquist Second Report, <u>id.</u>, 67–99).  Excluding the amount owed by the debtor in satisfaction of

16

the various subcontractors' liens, Lundquist opined that the "value of [the debtor's] accounts receivable collateral [as of February 8, 2012], net of ineligible accounts receivable, was [$797,428.00]." (Lundquist Aff., 6 ¶4). "Ineligible accounts receivable" consisted of "accounts receivable over 90 days old . . ., [an] offset account . . ., joint check[s] . . ., bonded jobs . . ., and retainage." (Id., 9 ¶11). Lundquist then opined that, as of April 18, 2012, the "net value" of BB&T's collateral had declined to $286,102.00. (Id., 9–10 ¶14).

The Lundquist Reports fail to bolster BB&T's claim that the diminution in the value of the debtor's accounts receivable was attributable to the debtor's "use" of the collateral. In her Initial Report, Lundquist exempted from the "net value" of accounts receivable those receivables which were more than 90 days old, a value of $72,682.00. (Id., 9 ¶11). BB&T explains that decision makes sense because "receivables aged 0–90 days are within the industry standard and are considered collectible," thus implying that receivables aged 91 days or older are not "considered collectible." (See Appellant's Br., 21). In any case, in her Second Report, Lundquist again excluded receivables aged 91 days or older, which then were valued at $513,849.00. The difference between receivables aged 91 days or older, as excluded in Lundquist's Second and Initial Reports, is $441,167.00. (Lundquist Aff., 10 ¶16). That difference reconciles almost the entire decrease in the value of the debtor's accounts receivable between January 2012 and July 2012, yet is attributable to a substantially smaller time frame. And, it far exceeds the deficiency now claimed by BB&T. That is to say, BB&T's own evidence demonstrates that the passage of time, not the debtor's "use" of BB&T's accounts receivable, plausibly could have caused the deficiency.

Moreover, Lundquist's Reports are doubly dubious in light of Lundquist's note that the debtor's average collection time on accounts receivable was 147 days. (Lundquist Second Report,

17

83).  That observation plausibly suggests that excluding accounts receivable aged 91 days or older, the purported "industry standard," was not the approach most in line with the debtor's business practices and did not reasonably approximate the likelihood that the debtor would collect on a given account.  Thus, the bankruptcy court did not err in rejecting BB&T's arguments grounded in Lundquist's Reports.

In any event, for somewhat technical reasons, the bankruptcy court also did not err in holding that BB&T failed to prove that the decline in the value of the collateral securing the debtor's obligation was a consequence of the automatic stay.  If BB&T had been granted release from the automatic stay and allowed to foreclose on the collateral on February 8, 2012, its argument goes, it could have collected accounts receivable in the amount of $797,428.00.  But, BB&T contends, it received substantially less than that amount as a result of the automatic stay.  In support of its position, BB&T relies on Lundquist's Reports, as well as the debtor's monthly reports.  (See DE 8-1, 39; DE 9-1, 179, 234; DE 10-1, 25, 63, 142; DE 11-1, 13).

BB&T has not shown the value of the collateral securing the debtor's obligation as of the time the debtor converted this case from Chapter 11 to Chapter 7.  Because BB&T did not demonstrate the value of the debtor's accounts receivable at the time of conversion, BB&T cannot prove that those accounts suffered a decline over the relevant time period, the debtor's Chapter 11 case.  BB&T suggests that its inability to demonstrate the value of the collateral securing the debtor's obligation at the time of conversion is a result of the debtor's failure to file timely monthly reports.  However, this argument is not worthy of credit. A creditor seeking a superpriority claim is required to police its interest, or risk losing its claim.  See Cheatham v. Cent. Carolina Bank & Trust Co. (In re Cheatham), 91 B.R. 382, 388 (E.D.N.C. 1988) (holding creditor "assumed the risk"

18

of inadequate adequate protection payments). The local bankruptcy rules require Chapter 11 debtors to file a "monthly report" "within 30 days, following the end of the month in which the petition was filed or date of conversion from another chapter, and subsequent reports on or before the thirtieth day of each month thereafter." Local Bankr. R. 4002-1(c)(2). There is no evidence that BB&T attempted to compel the debtor to file the missing reports. By not attempting to compel the debtor to produce accurate, up-to-date information, BB&T forfeited its ability to demonstrate that the value of the collateral securing the debtor's obligation declined as a result of the automatic stay.

In sum, the bankruptcy court did not clearly err in denying BB&T's superpriority motion on the record before it.

C.    The Bankruptcy Court Did Not Clearly Err in Calculating The Extent Of BB&T's Oversecurity For Purposes Of BB&T's Expense Motion

The second issue on appeal is whether the bankruptcy court appropriately calculated the extent of BB&T's oversecurity for purposes of an award of post-petition interest, costs, and fees, pursuant to § 506(b), and, in particular, whether it should have included the more than $800,000.00 that the debtor realized on its accounts receivable during the debtor-in-possession period as part of that calculation. BB&T argues that the bankruptcy court should have calculated BB&T's equity cushion as follows: the amount realized by the debtor on its accounts receivable collected during the debtor-in-possession period, plus the amount collected by the Trustee during liquidation, minus the fees allowed to the Trustee pursuant to § 506(c), and minus the value of BB&T's secured claim. However, the court need not determine whether the bankruptcy court applied the wrong formula., or applied the formula incorrectly Assuming BB&T's position is correct, the court holds that the bankruptcy court appropriately calculated BB&T's oversecurity based on the record before it.

19

BB&T failed to prove what portion, if any, of the moneys collected on the debtor's accounts receivable during the debtor-in-possession period was unencumbered by other, senior liens.

As the movant, BB&T bore the burden of demonstrating the extent of its oversecurity by a preponderance of the evidence.  See Fin Sec. Assurance Inc. v. T-H New Orleans, L.P. (*In re* T-H New Orleans, L.P.), 116 F.3d 790, 798 (5th Cir. 1997); *In re* Gwyn, 150 B.R. 150, 154 (Bankr. M.D.N.C. 1993); see also Prudential Ins. Co. v. SW Boston Hotel Venture, LLC (*In re* SW Boston Hotel Venture, LLC), 748 F.3d 393, 409 n.1 (1st Cir. 2014) (citing approvingly *In re* T-H New Orleans); *In re* Heritage Highgate, Inc., 679 F.3d 132, 140 (3d Cir. 2012) (holding creditor bears ultimate burden of proof on amount of secured claim); Stancill v. Harford Sands Inc. (*In re* Harford Sands Inc.), 372 F.3d 637, 640–41 (4th Cir. 2004) (same).  BB&T's interest in the debtor's accounts receivable was junior to the various subcontractors' liens.  Secured creditors with a senior interest in a particular item of collateral are entitled to recover their expenses under § 506(b) first, even if such expenses are collected to the detriment of another secured creditor with a junior interest in the same collateral.  See Collier, supra ¶506.4[5].  Thus, the post-petition interest, costs, and fees arising from the subcontractors' several liens on the debtor's property, including its accounts receivable, fairly would be included in their secured claims.  K.H. Stephenson, 768 F.2d at 583–84.  BB&T was not entitled to any portion of the $800,000.00 realized on the debtor's accounts receivable by the debtor during the debtor-in-possession period, because BB&T failed to show what portion of that $800,000.00 would be unencumbered by senior security interests.  Thus, BB&T failed to demonstrate to the bankruptcy court the extent of its oversecurity.  Accordingly, its expense motion properly was denied.

20

## CONCLUSION

Based on the foregoing, the court AFFIRMS the order of the bankruptcy court.  Because the facts and legal arguments are adequately presented in the briefs and record, the court dispenses with the argument requirement under Federal Rule of Bankruptcy Procedure 8019(b), as argument would not aid significantly the decisional process.  The clerk of court is DIRECTED to close this case.

SO ORDERED, this the 9th day of May, 2016

LOUISE W. FLANAGAN
United States District Judge

21